United States v. Harry. Thank you. I think you've waited patiently, but we're still very good to hear from you, so we'll start. Mr. Harvey? Good afternoon. Please the court. I'm Bruce Harvey from Atlanta here on behalf of Mr. Harry. We've just discussed some of the evidence in Mr. Harry's case. In Mr. Wiley's case, Mr. Harry advances two specific arguments to this court. And we have spent some time discussing how factual findings at sentencing really advance what a sentence may be. And one of Mr. Harry's primary arguments would be that he was entitled and that the district court erred in finding him ineligible for the safety valve. The safety valve, of course, has subparts to it. The only issue with regard to Mr. Harry's subpart is whether or not he possessed a firearm during the course and in connection with the offense of conviction. You know, there is, I think, a shifting burden. Any enhancement in Mr. Harry, I mean, yes, Mr. Harry got a 2D gun enhancement. That enhancement must be proven by the government. But under the safety valve, Mr. Harry has the burden of showing that he is eligible for it. But one of the components of that is the gun. So that means that he needed to show that it was more likely than not that the firearm did not have an access to his offense. Right. Well, yes, under the safety valve. But what about the 2D enhancement in which he, the government, had to prove that the gun was connected to the offense? Right, but I thought you were challenging the lack of safety valve. I am, but it contains two components, I think, of who has the burden. I mean, how do you deal with all of the 924C cases where this court has affirmed findings by juries beyond a reasonable doubt that guns were possessed in connection with the drug dealing under facts that seem rather like this? Because if I understand the facts correctly, some of these guns were in proximity to a large amount of drugs in his bedroom, in his house, which is also sort of surveillance enabled so that he can detect intrusions into that area. Why is that not enough, even if the burden proves on the government, to show by a preponderance of the evidence that these guns had something to do with those drugs? Well, I think we're piling inference upon inference. The surveillance that you mentioned, many houses have internal surveillance and external surveillance. That's not necessarily something that... He didn't have surveillance on the upstairs, did he? No. Where other people lived. He had surveillance on this room, which is where the quantity of fentanyl was found.  And the guns were found. Yes, and the explanation for that, I believe at trial, was I have family that stays in that room and we wanted to have surveillance on that room in particular to manage the problems. And Mr. Wiley is staying in that room from time to time. Yes, that's correct. And one of his at trial points was, this was Mr. Wiley's, not mine. But that's not an issue. I know, I'm not going there. I'm not going there. And I'm trying to direct myself directly to your question. I understand that combination, but this court has also said that we need more than mere proximity to be able to deny the safety valve and to find the 924C connection. What about the fact that his drug operation was large scale? Or the fact that he admitted that he carried a pistol on his person almost at all times? Or that he had an assault rifle, three or more guns, and he also had loaded magazines of ammunition. And the fact that some of them were not registered to him or that the assault rifle was illegally possessed. So it's not just proximity, right? Well, I think it is because each weapon that you just mentioned was in proximity but not in use and not readily available other than the weapon he was found with when he was arrested, which had no connection whatsoever to any drugs or any drug transaction. There was a weapon in his business that was in a sheath. It was in a bag. There was a weapon that was not readily accessible to him physically if there was any problem. So I don't think we have anything other than proximity. As Gertrude Stein would not say, there's no more there. There's no there there. There's presence. I'll grant the presence. We have to grant the presence. Is there anything more than mere presence that is required by your jurisprudence? And I get the analogy to the 924C, but you still have to have more. Mere proximity does not answer. Pick any of those 924C cases and tell me why this is less than was there. Well, because it doesn't have anything other than inferentially that connection. But what would be, in your view, something that is not an inferential connection other than actual use or being seen with a weapon? Certainly there are circumstances where there's a nexus where there's not use or there's not something. I don't know. I guess you keep mentioning sort of the inference. What type of what's the scenario other than use that it would be an inference that would be proper to find a nexus? Well, there has to be there has to be some connection. If you're carrying the. Well, something other than. Other than carry physical carrying it. A weapon that is readily, when I say readily, it is there, right? Available, not in a drawer, not in a bag. It's not really available if it's in a drawer. No, not in this particular instance. Doesn't that become proximity then? Like, I mean, you're sitting here trying to make a line by saying proximity is not enough. And then we're saying, OK, and then you're saying it has to be readily accessible. Aren't we back into proximity? No, no. We're factually determining the difference between proximity and accessibility. One's physical presence and mere presence. One is the ability to quickly gain access to and readily gain access to the item itself. Are the guns in that bedroom all in a gun safe? I'm sorry? Are the guns in that bedroom all in a gun safe? No, no, they're not. They're not in a gun safe. They're not locked away in any fashion. Don't. So what exactly is it that makes them not readily accessible? Well, if you're sitting in your fortified room with your surveillance about what's going on in that room and your surveillance about what's going on outside, and you see somebody approaching who might be a cop, might be one of these drug stealers, and what does he have to do to get access to those guns in that circumstance? That's so difficult. The gun was contained in a drawer, not on top of anything but underneath other items. So you would have to open the drawer. You'd have to root through the drawer. And if you're a drug dealer and you have to open a drawer and root through clothes in order to gain access to your weapon, it is nothing more than proximate. Okay, I get the argument. And, you know, the judge specifically said this is a very close call. That was what the court's ruling was. And if it depends upon piling inference upon inference and using speculation in order to accept those inferences and make a finding, then the close call should go for the defendant, shouldn't it? If it's a close call, because we know how much difference a sentencing finding makes. If you make a 2D gun enhancement as a two-level upward boost, a finding that the weapon was connected to the offense eliminates the safety value. So we have a two-level boost on the one hand. The two-level boost doesn't matter, right? He got the mandatory minimum sentence. Yes. So the two-level boost is irrelevant. That's why you didn't attack the two-level boost. You're attacking the safety valve because that's the only thing that matters here. Because absent the safety valve, as far as his sentencing is concerned, he's done for. He's got that sentence, period, full stop, end of story, if he doesn't get the safety valve. You know, there's a little bit more to it. You know, when you sit there in front of a sentencing judge and you start at level X, the judge considers the starting point. I mean, that's the whole point of the U.S. Supreme Court saying, okay, the guidelines are not mandatory anymore. The mandatory minimums are, and the court is constrained to give him 120 months regardless of the gun enhancement. I mean, this is all your argument. The only argument you make, and it's right that it's the only argument you make, because the only one that matters to his sentence is does he get the safety valve. Yeah, at the end of the day, but where you start also determines where you end, regardless. That's not even a word. Regardless of the mandatory minimums. So it's a little bit more complex than it doesn't make any difference because the starting point does make a difference. What were his guidelines? I'm sorry? What were his guidelines? Well, that also depended upon, I think it was. What were his guidelines without the two points? I think without the two points. Right. It was obviously under the guidelines where they were. I don't know the numbers. Well, was it not in excess of 120 months? Yes. I mean, didn't she give him the least she could possibly give him? Yes. So all we're talking about here is the safety valve. Yes. Okay. In strict terms, yes. How about in lenient terms? Well, she couldn't give him less than the 120. I get that. I'm just saying that when you stand in front of a sentencing judge, where you start makes a difference. It didn't particularly make a difference in this case because she gave him the mandatory minimum. And it was a close call according to the court. I just don't think that given the inference piled upon inference in this particular instance, that the denial of the safety valve was factually warned. Number one, let's move to, if we can. Just very briefly, if you can. All right. Well, you know, a poll cam. Poll cams are going to be issues that we are going to see. We, I say the defense bar, the government, the courts. So what makes the poll cam issue potentially difficult is the fact that the analysis is a spectrum. On one hand, we have physical surveillance from police saying that a vantage point accessible to the public is a not search. And on the other hand, we have the cases about CSLI, which has all consuming, all trafficking. And I think the in your very over time argument, if you could explain why you think that this is more like a CSLI collection and less like run of the mill. Well, because we have essentially a mosaic effect. You know, the the Supreme Court and Carpenter said a that we totally know Carpenter. If you could tell us why you think is your best argument for the fact that it is more like CSLI and less like a camera. Well, because it is 24 7 surveillance. It's the fact that it's it's 24 7 and it sees everything and there's no interruption. That's that's correct. I mean, it's the George Orwell argument, essentially, that eyes are always watching you and they are the government's eyes. What do we make, though, of the fact that in terms of the issue of whether or not there's a reasonable expectation of privacy, that we're talking about a camera here that's outside of a business, not outside of an individual's home, which seems to be the scenario that is more frequently addressed. Because the idea is there is not presumably an expectation of privacy in the street outside your business where people want people to come in where it seems distinct to me from a home. Well, I think there is a distinction with a home. There clearly is. One is a business and one is the most protected aspect of our lives constitutionally. And that's the home. But, you know, I hate to keep dropping back to Carpenter. But you have in Carpenter specifically said in the basis for that opinion is that there is a reasonable expectation of privacy in the whole of your physical movements. And if it is your business and you are there and the government played, what, 28 minutes of these tapes, you have some reasonable expectation of privacy in the whole of your physical movements, not as much as the home. In Carpenter, you have the ability to track a person's movement all over town, wherever he goes for as long into the past as he had his cell phone. Here, you have a rather limited period of time during which the government is surveilling one location. I understand that difference, but it fits into the pattern of the mosaic pattern of your life. The government has the ability to surveil you in the whole of your physical movements, whether it's by physical surveillance, whether it's by pole cam surveillance. It's the whole of going in and outside of your business. It's not when you go to vacation with your family. It's not it's not figuring out what your searches are on the Internet. It's in a particular location. Well, that's that's the first prong, of course, of of what we're talking about here. Does anybody have a privacy interest in physical surveillance of your business that is in presumably a public place? And here it was in a public place. I might want to ask if the presider will allow just a related question. So we had the wiretap evidence. We had the drugs in the residence and an action audio. Why would that not be enough to convict Harry? In other words, why wouldn't it be harmless error to admit the pole camera footage if we decide that it was an improper search? Well, the government is argued harmless error. But if we take out portions of this mosaic, then the jury has the ability to make a different point. You're saying the wiretap evidence and the drugs in the residence wasn't enough. Well, the district court wouldn't have the jury would have done something different. I don't know whether it's enough or not. I mean, and I would, of course, say no. But because some of that evidence requires, again, piling inference on inference. Thank you. Good morning, and may it please the court. Connor Reardon for the United States. I'll start with the safety valve issue. There is, as opposing counsel put it, very much a there there. This court's section 924C cases tell us how to determine if there's a there there. And in this case, the record evidence evaluated with reference to the factors articulated in those cases. Comfortably established a nexus between Harry's drug trafficking and his small arsenal of weapons. The issue of the two point enhancement was not raised in the opening brief. So what other than proximity do you think establishes? Sure. So to start with the first factor, factor articulated in snow and where we start in our brief, the type of drug, drug trafficking activity involved. We were talking about a defendant who was found with multiple kilos of drugs in his home, the same location as the weapon. I understand that we're not talking about proximity, but multiple kilograms of drugs as part of this ongoing conspiracy. This sort of drug activity, not one off transactions, but a large enterprise lending itself to the need for protection with firearms. The types of weapons involved. These are not hunting rifles to draw an example from the commentary to the enhancement. We have handguns frequently used in connection with drug trafficking. We have an assault weapon that the district court determined and that Harry does not contest, could not be lawfully possessed by him in the state of Connecticut. Each of the four weapons found at Harry's home and Harry's business was found loaded. And so the condition of the weapon also tends to support that there was a connection with drug trafficking activity and that the weapons were easily accessible in order to protect his considerable drug stashes should the need arise. That connection is all the more clear given the presence of quite an elaborate security system, not only at Harry's business, Action Audio, but in his home. It is the case, as opposing counsel pointed out, that there are many homes that possess security systems. In my experience, at least, it is rare to have a large screen television mounted in one's bedroom above a dresser containing a firearm and, you know, within feet of a kilogram of fentanyl and a kilogram of cocaine. And so the ultimate question under Section 924C is the potential utility of the weapon, which could be actual, could be theoretical, to be used in connection with drug trafficking, including to protect the drug dealer, drug proceeds, drug paraphernalia, drugs themselves. We think that that was pretty plainly established in this case, particularly given that it was the defendant's burden to show that he was eligible for the safety valve and not, as in the cases that we cite, the government's burden to prove the connection between the gun and the drugs beyond a reasonable doubt. And to prove it beyond a reasonable doubt in the 924C cases. Correct. So we draw from those cases simply because the body of precedent is significantly more developed under 924C than it is under the safety valve. But we're talking about, you know, a different burden that's allocated quite differently. With respect to the Fourth Amendment question, it's a bedrock principle of Fourth Amendment law that what a person knowingly exposes to the public is not a subject of constitutional protection. Nearly every court of appeals to have considered the question has applied that precept to hold that. Is there some point, is there any length of time of surveillance or comprehensiveness of information via full camera that you think would cross the line? I don't think that that is a question that the court needs to answer in this case. One, because the surveillance went on for 50 days, which is comfortably within the parameters that other courts of appeals have addressed. Two, because the surveillance was of Harry's business rather than his home. And then potentially third, because of the availability of good faith. And I guess fourth, because of harmlessness. However, it would be the government's position that no, if what the government is surveilling is a single location, that that may capture what the Seventh Circuit in Tuggle called an important sliver of a person's life. But it is not a section of a person's life that remotely approaches the all-encompassing, comprehensive window into a person's intimate activities that the Supreme Court addressed in Carpenter. You're basically saying that Carpenter is, at least so far as we know, an exception to the bedrock principle that you started with. I think that's exactly right, Your Honor. And I think that this court should take Carpenter on its own terms and take seriously its affirmative caveats about what the decision did not do. It was self-avowedly a narrow decision that did not call into question, is the phrase, let alone invalidate conventional surveillance techniques and tools. So I was interested in the use of security cameras in Carpenter. Is it possible that the Supreme Court meant a home security camera that one uses personally as opposed to a government tool? So I think that would be odd, because one's use of a security camera in one's home does not implicate the Fourth Amendment. And so it would be unusual to characterize that as a conventional surveillance technique, given that the Fourth Amendment is inapplicable within a private home. As for the locution security camera versus poll camera, I'm generally not a fan of reading Supreme Court opinions as though they're statutes. But, you know, it is the case that we include a footnote in our brief that sets forth several definitions for the term security camera that would comfortably embrace the camera that was used here and would comfortably embrace poll cameras generally. Beyond Carpenter's affirmative caveats about what the decision does not do, does not reach, does not call into question, we have Carpenter's reasoning about just why it was that the case was, I think Judge Lynch put it well in the question, essentially making an exception or a limited incursion on the general principle that what one exposes to the public is not a subject of Fourth Amendment protection. And given the court's reasoning along those lines, poll cameras simply don't implicate the concerns that drove the result in Carpenter. We briefed those issues fairly exhaustively. I'm happy to answer any questions that the court has. But otherwise, we will rest on the briefing and ask the court to affirm. Thank you.  There is, of course, a considerable difference between a surveillance camera that one has for themselves and a government surveillance. And the Tuggle Court answered it correctly. Three of the judges on that panel said we believe poll cameras implicate the Fourth Amendment. Three said we don't believe poll cameras implicate the Fourth Amendment. So there is a considerable disagreement in courts across the country like yours that say, yes, there is implications, Fourth Amendment implications. And no, there isn't. So it's a reasonable argument to make that poll cameras do, in fact, take us outside the normal ability of 24-7 physical surveillance into a quite physical surveillance with poll cam 24-7 surveillance. If it's that disputed, is there now, is there a good faith exception available to the government? I'm sorry? If it's that disputed, as you just said, is there a good faith exception available to the government? Well, I don't think there is a good faith exception based upon the fact that this, if the Fourth Amendment is implicated, it is a warrantless search. And I don't believe warrantless searches fall within the good faith exception because the good faith exception is grounded on the fact that whether the affiant is right or wrong, it is passed through a magistrate judge or a judge who then approves it. So I don't believe that the good faith exception applies to warrantless searches would be my answer to your question. You agree with me, right? Yeah, we understand, yes. All right. All right. Thank you so much. Thank you. We have your argument. Thank you both. We'll take this case under advisement.